IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHIRLEY A. QUARRY,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )          Civil No. 04-825-CJP
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

## MEMORANDUM and ORDER

In accordance with **42 U.S.C. § 405(g)**, plaintiff Shirley A. Quarry seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) pursuant to **42 U.S.C. § 423**.

### Procedural History

Plaintiff filed an application for DIB in February, 2001, alleging disability beginning on October 30, 2000.  (Tr. 51-53).  She claimed disability due to memory loss after chemotherapy, depression, anxiety, pain in neck, arm, hip and upper stomach, and racing heart.  (Tr. 64).

The application was denied initially and on reconsideration.  At plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) Ira Sandron on June 11, 2002.  (Tr. 196-222).   ALJ Sandron denied the application for benefits in a decision dated July 12, 2002.  (Tr. 13-20).  Plaintiff's request for review was denied by the Appeals Council, and the July 12, 2002, decision became the final agency decision.   (Tr. 4-6).

Plaintiff has exhausted her administrative remedies and has filed a timely Complaint in this Court.

### Issues Raised by Plaintiff

Plaintiff argues that the ALJ's decision denying her benefits was not supported by

-1-

substantial evidence in the following respects:

    1.      The ALJ failed to consider plaintiff's obesity and fatigue.

    2.      The hypothetical question posed to the vocational expert was flawed because it did not include obesity and fatigue.

    3.      The jobs that the vocational expert testified to are not within the limitations of the hypothetical question as posed.

### The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record.

**1.**    **Plaintiff's Testimony**

Plaintiff was represented at the hearing by attorney Kenneth D. Rose. (Tr. 198).

Shirley Quarry was 52 years old at the time of the hearing on June 11, 2002. She was 5'3" tall, and weighed 192 pounds. (Tr. 198). She has a twelfth grade education, along with some business and real estate classes. (Tr. 200).

She last worked on October 20, 2000, as an officer manager for a Dr. Williams. She had also been employed by Harrisburg Medical Center as supervisor of admissions. In that job, she oversaw the switchboard department and registered patients. (Tr. 200-202). At the time of hearing, she was selling Mary Kay cosmetics. Her husband and others assist her with filling and delivering orders. (Tr. 202-203). She answers the phone and takes the orders, and helps her husband fill the orders. (Tr. 214). She has 30 to 35 customers. (Tr. 215).

Ms. Quarry left the job at Dr. Williams' office because she was "so stressed out." She felt fatigued, which aggravated her "dealing with the public." (Tr. 204).

She had surgery for breast cancer in 1995, followed by chemotherapy and radiation. She

then had breast reconstruction and reduction surgery in 1998).  (Tr. 204).

Ms. Quarry testified that she cannot work because she is fatigued and depressed.  She has anxiety attacks.  She cries daily.  (Tr. 205).  She has been diagnosed with a sleep disorder.  (Tr. 206).  She gets only 3 to 4 hours of sleep a night.  (Tr. 216).  She goes back to bed every day for one to three hours.  (Tr. 206, 215).

She has pain in both hips, worse in the left.  She has pain from the ankle to the calf, and knee problems.  (Tr. 208-209).  She had surgery on her left knee, but the knee is worse.  She has pain and a grinding, bone-to-bone sensation.  (Tr. 209).  She also has pain in her left shoulder and under her arm where lymph nodes were removed.  (Tr. 209).  The left shoulder hurts most of the time.  It aches and feels weak.  (Tr. 210).  She also has pain in her ankles and neck.  (Tr. 210).

She has pain in all the areas mentioned every day.  (Tr. 213).

She can stand for 10 minutes "in reasonable comfort."  She can sit for 30 minutes or less.  (Tr. 211).  She can walk less than a block, and can lift a gallon of milk.  (Tr. 212).

Ms. Quarry testified that she drives in Harrisburg, on days when she doesn't "feel quite as foggy as others."  (Tr. 215).  She sometimes has to stop and think about where she is and which way she should go even in areas that are familiar to her.  (Tr. 215).

She has not had any counseling or therapy from a psychologist or psychiatrist.  Her primary doctor and her rheumatologist prescribe medicine for her depression.  (Tr. 213-214).

## 2.  Testimony of Vocational Expert

Thomas Upton, Assistant Professor at Southern Illinois University and a Certified Rehabilitation Counselor, testified as a vocational expert.  (Tr. 39).  Plaintiff had no objection to his qualifications.  (Tr. 198).

Upton testified that plaintiff's work selling Mary Kay products was at the light exertional

level, and was semiskilled.  Her work at the doctor's office was sedentary and semiskilled.  Her

work at the hospital was light and skilled.   (Tr. 217).

The ALJ asked Upton to assume a person of Ms. Quarry's age, education, and work

experience, with limitation of lift and carry 15 pounds maximum, walk and stand 6 out of 8

hours, sit 6 hours with a sit/stand option, occasional bending, kneeling, crouching, stooping, etc.,

and no climbing; limited to simple, repetitive tasks with no stringent speed or quota components

and no frequent shifts.  (Tr. 217-218).  The VE testified that such a person could not perform the

plaintiff's past work.  He testified that such a person could perform the following work at the

light, unskilled level: production inspector (11,000 jobs), small parts assembly (19,000 jobs), and

cashier (36,000 jobs).

Upton also opined that, if he were to assume that Ms. Quarry's testimony were

completely credible, she would not be able to perform any competitive employment because of

her pain, memory loss, and fatigue necessitating that she go back to bed for 1 to 3 hours every

day.  (Tr. 219).

On cross examination, Upton conceded that she could not do small parts assembly

because that is quota work.  He testified that production inspector is also quota work, but the

inspector need not examine every item.  Cashier work can be "quite hectic" and does involve

interaction with the public.  (Tr. 220).

**3.**      **Medical Records - Dr. Alexander**

Dr. Alexander's records from December, 1998, through January 24, 2001, indicate that

he saw plaintiff on about 13 office visits during that time.  (Tr. 152-157).  She complained of

depression, anxiety, and tearfulness.  She had menopausal symptoms, including hot flashes.  He

prescribed various medications, including Serzone and Celexa.  In November 1999, he noted she

was sleeping "okay" and was up to 5 hours at a time.  He changed her medication from Serzone

to Paxil.  (Tr. 155).  On December 14, 1999, she stated she was sleeping "excessively."  He suggested she seek counseling.  He directed her to continue Paxil at the same dosage.   (Tr. 154).

On January 25, 2000, Ms. Quarry was doing better.  She told Dr. Alexander she "can really tell when she's missed a pill" and that otherwise, she "feels fine." (Tr. 154).

On March 14, 2000, plaintiff had gained some weight and complained of feeling "drugged up in the morning."  He prescribed Remeron to take at bedtime.  (Tr. 154).

On November 3, 2000, her medication was changed to Celexa for depression.  (Tr. 153).  Dr. Alexander described her affect as "bright" on November 30, 2000, and on December 28, 2000.  (Tr. 152).  Her examination was "unremarkable" on the latter date.

On January 24, 2001, she was still having problems with tearfulness, and told Dr. Alexander she was "tired of being this way."  He noted her affect was a little bit better.  He stated "More than likely has a lot of problems with menopausal change.  Unfortunately there is nothing I can give her chemically."  (Tr. 152).  Ms. Quarry again complained to Dr. Alexander of anxiety and feeling not "her usual self" on April 5, 2001.  He encouraged her to see a counselor, and gave her several options.  (Tr. 184).

On July 6, 2001, Ms. Quarry told Dr. Alexander that her mood was improved but she still had occasional episodes of crying.  (Tr. 183).  She was sleeping well through the night and her appetite was normal.  She had a low energy level.  He described her as alert and oriented, with a slightly diminished affect, but "very friendly and talkative."  (Tr. 183).  She asked for pain medication to use during a long car ride to visit her in-laws.

On October 1, 2001, she complained that she was not doing well and could not stand to leave the house.  "She is not happy with her business which has always been one of the highlights of her life."  (Tr. 182).  He recommended that she see a psychiatrist or psychologist at Southern Illinois Behavioral Sciences.

**4.**      **Medical Records - Dr. Richard C. Lehman**

Dr. Lehman saw plaintiff for complaints of pain in her hips and knees on May 22, 2001. (Tr. 162).  A bone scan performed on June 1, 2001, showed degenerative changes in both knees, ankles, and the left first metatarsophalangeal joint.  (Tr. 163).  Dr. Lehman performed arthroscopic surgery of the left big toe and knee on August 13, 2001.  (Tr. 173-174).

**5.**      **Consultative Examination - Harry J. Deppe, Ph.D.**

Dr. Deppe performed a psychological examination at the request of the Bureau of Disability Determinations Services on May 4, 2001.  (Tr. 158-161).  He noted that she had never been treated by a psychiatrist or psychologist, but was taking medication prescribed by her family doctor.  She complained of anxiety and nervousness.

Her memory for recent and remote events was within normal limits.  Her judgment and insight appeared only fair.  She had no symptoms associated with psychosis or organicity.  Her ability to perform simple calculations was adequate.  Her mood and affect were unremarkable. He opined that she was suffering symptoms associated with generalized anxiety disorder.

Deppe concluded she had no impairments in her ability to relate to others,  ability to understand and follow simple instructions,  ability to maintain attention required to perform simple, repetitive tasks, or ability to withstand the stress and pressures of day-to day work activity.  He also concluded that her social functioning and ability to care for personal needs were intact, but that she had mild changes in her interests and habits, and mile restrictions of her daily living activities.

**6.**      **Consultative Examination - Dr. Raymond Leung**

Dr. Leung examined plaintiff on September 20, 2001.  (Tr. 164-167).  Her chief complaints were left hip and knee pain.  She stated that she had arthroscopic surgery of the left knee, but that it did not help.  He noted that she was obese.  Her gait was normal.  She had no

difficulty getting on or off the exam table.  She had difficulty with heel walk and was unable to toe walk.  She had forward flexion to 90 degrees with no pain or muscle spasm.  She had decreased range of motion of the hips and knees.  Flexion of the left knee was 130 degrees.  Flexion of the right knee was 140 degrees.  She had good grip strength, fine finger movements, and finger-thumb opposition.

Ms. Quarry told Dr. Leung that she could walk only one half block, and could lift only up to 15 pounds.  She was somewhat emotional and teary.

 **7.**     **State agency physician reports**

On October 21, 2001, Dr. B. Rock Oh concluded that Ms. Quarry was capable of light work activity with restrictions of only occasional kneeling, crouching or crawling, and no climbing of ropes, scaffolding or ladders.  (Tr. 104-111).  He noted that she had mild degenerative joint disease of both knees and ankles, and some limitation of movement of her hips.  However, he found that she could occasionally lift up to 20 pounds and frequently lift up to 10 pounds, and that she could stand/walk  for 6 out of 8 hours and sit for 6 out of 8 hours.  Her ability to push/pull was unlimited and she had no manipulative limitations.

On August 3, 2001, Donald Henson, Ph.D., concluded she had symptoms of anxiety, but that her cognitive, attentional and functional skills were adequate for simple, routine activities.  She had no limitations of her understanding or memory.  She had no limitations of her ability to carry out short and simple instructions, or to sustain an ordinary routine.  She had the ability to make simple work-related decisions.  She had moderate limitation of her ability to carry out detailed instructions and to maintain attention and concentration for extended periods.  He concluded that she had no limitation of her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  Her social and adaptive skills were not impaired.

Mary Helen McGreevey, Psy.D., also concluded that she had anxiety disorder, but that she was able to perform and sustain simple tasks which have few social demands with the general public.  (Tr. 130-132).

**<u>Applicable Standards</u>**

To qualify for disability insurance benefits, a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55**

**F.3d 309, 313 (7ᵗʰ Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the Court must determine not whether Plaintiff is, in fact, disabled, but whether ALJ Pritchett's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).**   In analyzing the ALJ's decision for "fatal gaps or contradictions," the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it. ***Johnson v. Apfel*, 189 F.3d 561, 564 (7ᵗʰ Cir. 1999)**.

## <u>Analysis</u>

The ALJ properly followed the five-step inquiry.  He found that plaintiff has severe impairments, but that her impairments do not meet or exceed a listed impairment.  Plaintiff does not challenge this finding.

The ALJ questioned whether Ms. Quarry's involvement in selling Mary Kay products constitutes substantial gainful activity.  He deferred answering that question because he found that she is not disabled.

The ALJ found that plaintiff is unable to perform her past relevant work.  He concluded

that plaintiff's testimony was not credible because it was inconsistent with the medical evidence and with her statements to medical sources.  He then found that she has the residual functional capacity to perform a limited range of light work activity.

Plaintiff's first point is that the ALJ failed to consider the effect of her obesity and her fatigue.

Obesity itself is not an impairment, but the ALJ must consider the effects of obesity. **SSR 00-3p;** *Skarbek v. Barnhart*, **390 F.3d 500, 504 (7th Cir. 2004)**.  **SSR 00-3p** was in effect at the time the ALJ considered this case.  It has been superceded by **SSR 02-1p**, but the Seventh Circuit has noted that there were no substantive changes.  *Skarbek*, **390 F.3d at 504.**

The ALJ did not explicitly examine the impact of Ms. Quarry's obesity.  Defendant argues that this omission does not require remand because the ALJ's decision was consistent with the reports of doctors who did note that she was obese.  The Commissioner relies on *Skarbek v. Barnhart*, **390 F.3d 500 (7th Cir. 2004)** for this proposition.

Like the plaintiff in *Skarbek*, Ms. Quarry does not specify how her obesity affects her RFC except to suggest that her weight combined with arthritis in weight-bearing joints may cause her more pain and limitation than would arthritis alone.

The Court finds that a remand for consideration of the effects of obesity is not warranted here.  ALJ Sandron concluded that plaintiff has the ability to do light work with restrictions.  He adopted the postural limitations found by the state agency physicians, but added the restriction of a sit/stand option because it was supported by the objective medical evidence.  (Tr. 18).  The state agency physicians, Dr. Leung, and Dr. Alexander all noted plaintiff's weight.  (Tr. 111, 152, 166).  "[A]lthough the ALJ did not explicitly consider [plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions." *Skarbek*, **390 F.3d at 504.**

The vocational expert testified that there are significant numbers of jobs at the light

exertional level with the restrictions found by the ALJ, including a sit/stand option.  (Tr. 218,
221).  Plaintiff points to no evidence that her obesity in fact has any additional or cumulative
effect on her condition which would not be addressed by the sit/stand option, and this Court's
review of the record revealed no such evidence.  "When an applicant for social security benefits
is represented by counsel the administrative law judge is entitled to assume that the applicant is
making his strongest case for benefits."  ***Glenn v. Secretary of Health and Human Services*, 814
F.2d 387, 391 (7th Cir. 1987).**

      Plaintiff also argues that the ALJ's failure to consider her fatigue requires remand.

      The ALJ did not fail to consider plaintiff's complaints of fatigue.  The ALJ did note that
Dr. Hoffmann, a rheumatologist, saw plaintiff on May 8, 2002, and stated in her record that
plaintiff's "fatigue is undoubtedly due to a sleep deficit." (Tr. 16).  Dr. Hoffman's note states
that some time between the last office visit of November 1, 2001, and the visit on May 8, 2002,
plaintiff had undergone a sleep study which "did not find sleep apnea but did notice sleep quality
was poor."  (Tr. 186).   The ALJ noted that Dr. Alexander stated that, on the July 6, 2001, office
visit, she was sleeping well through the night.  (Tr. 17).  The ALJ also noted plaintiff's
complaint that her energy level was low.  (Tr. 17).

      The ALJ found that Ms. Quarry's testimony about her symptoms and limitations was not
fully credible.  (Tr. 17).  The ALJ obviously did not fully credit her testimony that she must go
back to bed every day for several hours because of her fatigue.  The credibility findings of the
ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the
witness.  ***Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).**   The credibility findings should
not be disturbed unless they are "patently wrong."  **See *Jens v. Barnhart*, 347 F.3d 209, 213 (7th
Cir. 2003)**.  Plaintiff does not challenge the credibility findings here.

      The ALJ found that plaintiff is limited to simple repetitive tasks with no stringent speed

-11-

or quota requirements.  This limitation accommodates her fatigue.  The record does not mandate a conclusion that plaintiff is fatigued to the point where she cannot do any substantial gainful activity.

Lastly, plaintiff finds fault with the vocational expert's testimony.  She argues that the production inspector work that the VE testified about is not unskilled.  However, as the Commissioner points out in her brief, the Dictionary of Occupational Titles lists at least three inspector positions (pencil inspector, stencil inspector, and rag inspector) which are unskilled. (Doc. 23, p. 11).

Ms. Quarry also suggests that the hypothetical question posed by the ALJ was faulty in that it did not include fatigue.  A hypothetical must set forth the claimant's limitations to the extent that they are supported by the medical evidence.  **See, *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir.1994)**; ***Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003)**.  The converse is also true: where a claimed limitation is not supported by the medical evidence, it need not be included in the hypothetical.  For the reasons already explained, the ALJ was not required to accept plaintiff's testimony about the extent of her fatigue.

In summary,  reasonable minds might differ as to whether Ms. Quarry is disabled within the meaning of the relevant standards.  However, the ALJ's decision is supported by substantial evidence in the record. **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995));  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**   As such, it must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and that the findings of the ALJ are supported by substantial evidence.

The final decision of the Commissioner of Social Security finding that plaintiff

Shirley A. Quarry  is not entitled to Disability Insurance Benefits is **AFFIRMED.**

**The Clerk of Court is directed to enter judgment in favor of defendant.**

**IT IS SO ORDERED.**

**DATE:  March 21, 2006.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**